UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **PHILIP A. HOLDEN,** | Civil Action No. 19-401 (SRC) |
| Petitioner, | |
| v. | OPINION |
| THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, et al., | |
| Respondents. | |

**CHESLER**, District Judge:

Presently before the Court are the habeas petition of Petitioner Philip A. Holden brought pursuant to 28 U.S.C. § 2254 (ECF No. 1) and Petitioner's request for an evidentiary hearing (ECF No. 2). Following an order to answer, Respondents filed a response to the petition (ECF No. 14), to which Petitioner replied. (ECF No. 16). For the following reasons, Petitioner's habeas petition is denied, Petitioner's request for a hearing is denied, and Petitioner is denied a certificate of appealability.

**I. BACKGROUND**

In affirming Petitioner's conviction, the Superior Court of New Jersey – Appellate Division summarized the relevant evidence presented at trial as follows:

> [Petitioner's] conviction after a jury trial [arises out of] numerous charges arising from his fatally shooting an innocent bystander during a dispute he was having with another person. The dispute allegedly arose out of both of their drug dealing activities. As a result of that incident, a grand jury returned an indictment charging [Petitioner] with first-degree robbery[,] second-degree aggravated assault[,] first-degree attempted murder[,] first-degree murder[,]

1

second-degree unlawful possession of a handgun[,] and second-degree unlawful use of a handgun[.]

[The robbery charge] was dismissed prior to the start of trial and the jury found [Petitioner] guilty of all remaining charges. Subsequently, the court sentenced [Petitioner] to a term of life imprisonment with a thirty-five year parole disqualifier on [the attempted murder charge,] and to a consecutive life term with a thirty-five year parole disqualifier on [the murder charge]. [The remaining charges were either merged with those two sentences or resulted in a concurrent sentence.]

. . . .

At trial, the State's witness, Elijah Agee, testified that on the night of January 11, 2010, he was standing outside of Manny's Liquor Store ("Manny's") in Newark, a spot where he admittedly engaged in selling heroin. On this particular night, however, Agee testified he was not selling drugs and was instead "engaging in horseplay with two fellow peers." Agee testified that while he was socializing, he was approached by three men with whom he ultimately became involved in a fist fight. He believed that the three men confronted him because they wanted to force him to "split the sales" from his business dealing heroin, but he was not interested in doing so. Agee recognized one of the three assailants who struck him, and stated that the two had exchanged words the previous day in front of Manny's. Agee estimated that the fight lasted approximately ten minutes, and ended when he chased the three men around the corner with a baseball bat he had retrieved form a friend's car. Eventually, Agee caught up to one of the men, who was not [Petitioner], and hit him with the baseball bat.

Agee testified that he returned to the area in front of Manny's because his house keys and Bluetooth had been misplaced over the course of the fist fight. Agee stated that as he bent down to look for his keys, he "saw a guy coming from Twelve [Street] and threw a shot, and I just started running." Agee stated that he heard "about four" shots fired, and was able to escape the area without being hit by running through a vacant lot around the corner. When Agee fled the area, he was unaware that someone had been shot.

Craig Palmer, a second witness for the State, testified that he came to Newark on the night of January 11, 2010[,] to purchase heroin from a drug dealer he knew as "Youngen[," which was revealed to be Agee's street name.] He testified that upon driving in to the area by Manny's, he saw "four dudes scuffling. Basically

2

it was a three on one.  You can tell that's how it was.  And then all of a sudden . . . [Agee] produced a bat out of somewhere and started chasing these dudes down Thirteenth Street.  And after that I just continued down Sixteenth Avenue."  Once the fight had ended, Palmer and his friend approached the area where Agee stood in order to purchase heroin, but did not speak directly to him because Agee was "all souped up" from the fight that had occurred and was discussing the night's events with other people.

As Palmer and his friend waited off to the side, he observed [Petitioner] speaking with another man on the corner.  Palmer testified that he had previously encountered [Petitioner], known to him as "Whack," approximately two times in the past twenty-five years.  [Although the nature of their previous meetings was not revealed to the jury, the two men had previously served time together in prison.]  After [Petitioner] finished speaking with the man on the corner, he proceeded back towards Manny's.  Palmer stated that [Petitioner] "had both of his hands in his pocket and . . . he had a bandanna around his neck and he was trying to put his face through that bandanna."  Palmer testified that he was clearly able to identify [Petitioner] as he walked past him.  Palmer stated that when [Petitioner] was almost right in front of Manny's, "he just started shooting at [Agee]."  When the shooting began, Palmer ran. He also saw Agee run towards a vacant lot across the street.  Palmer stated that although he was not completely certain, he believed that [Petitioner] fired approximately six shots.  Initially, Palmer also did not realize that anyone was injured by the gunshots, and did not report the incident to anyone that night.

Police Officer Louis Waltman testified that on the night of January 11, he was on patrol duty when he received an alert from the "spot shotter," a device "that picks up gunshots" and uses GPS technology to guide officers to the location where the shots were fired.  Upon arriving at Manny's, Officer Waltman stated that the "first thing we did [was] scan the location for victims [of] which we did not see any."  However, four spent forty-five caliber shells were recovered in front of Manny's and in the immediate vicinity.

The next morning, police received a call "to respond to a possible sick or injured person" in a car parked near Manny's.  Eventually, they discovered the body of a woman in the driver's seat of her vehicle, later identified as Karen Cunningham.

Surveillance footage from Manny's showed Cunningham exiting Manny's just prior to the shooting.  She was apparently shot while returning to her car from the liquor store, and was able to get

3

into her vehicle before she passed away. According to testimony from the medical examiner, Cunningham suffered "a gunshot wound of entrance in the right upper arm and a gunshot wound of exit on the left upper chest." The autopsy revealed that the bullet had gone through Cunningham's chest, causing damage to her "aortic arch . . . left upper love of the lung . . . [and] second rib."

As mentioned above, neither Palmer nor Agee initially realized that anyone had been injured in the shooting, and neither man reported the incident to police. However, Palmer subsequently learned of Cunningham's death from a television news report. On the afternoon of January 12, police arrested Palmer during a traffic stop in Verona when they discovered an outstanding warrant for Palmer arising from his failure to pay a fine. The police transported Palmer to headquarters, where he eventually disclosed that he "was a witness to a homicide in the Newark [area]" and requested to speak to someone regarding what he witnessed. Although [Petitioner]'s attorney inferred that Palmer shared this information to avoid incarceration, Palmer testified that he did so because "it was eating at [him]" that an innocent bystander had been killed and that he had not come forward with what he knew. Palmer also identified [Petitioner] as the shooter when surveillance footage was played during the trial.

On January 12, Agee was also aware that police were investigating Cunningham's death because he was back in the vicinity of Manny's selling heroin. However, he did not voluntarily come forward at that time because he "was still doing what [he] was doing so [he] didn't want to draw no attention to [himself]." A few days later, Agee learned that police wanted to speak to him in connection with Cunningham's death. When Agee did finally speak to police, he initially told them that the fight broke out after he was robbed because he did not want to implicate himself as a drug dealer. However, he did tell police that someone had tried to shoot him. When the police subsequently showed a photo array to Agee and asked him to identify the man who fired the shots on January 11, identified [Petitioner] as the culprit.

[Petitioner] voluntarily surrendered to police on January 14, 2010. The police did not recover any weapons when they executed a search warrant at [Petitioner]'s home, which he shared with his girlfriend. In addition, police did not find any items of clothing in the home matching Agee's or Palmer's descriptions.

At trial, the State presented testimony from Agee, Palmer, Cunningham's husband, and several law enforcement officers and

4

personnel involved in the investigation of Cunningham's death. [Petitioner] did not testify on his own behalf, but presented testimony from his girlfriend, who stated that [Petitioner] was living with her in January 2010, and that on the night of January 11, 2010, he was at home with her and her daughters, preparing for his overnight shift at a Shop Rite in West Orange.

In addition, at trial, the parties entered into a stipulation regarding the gun used in the shooting of Cunningham. Specifically, the parties agree that the gun was also used in later shooting on August 15, 2010[,] and September 26, 2010, after [Petitioner] was already in custody.

During the charge conference conducted by the court, defense counsel did not request a passion/provocation manslaughter instruction to be given to the jury. At the conference, the judge stated that the proper lesser included offenses for [Petitioner]'s first-degree murder charges was "agg[ravated] man[slaughter] . . . and reckless manslaughter[.]" When asked if he requested the inclusion of any other lesser-included offenses in the charge, defense counsel stated that he "just s[aw] those two." The State responded the same. Accordingly, during the jury charge, the judge instructed the jury regarding the elements of aggravated manslaughter and reckless manslaughter, as well as murder.

After deliberations, the jury convicted [Petitioner] of all charges and the court subsequently sentenced him[.]

(Document 9 attached to ECF No. 14 at 1-12).

## II. DISCUSSION

### A. Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." The petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*,

712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, --- U.S. ---, ---,132 S. Ct. 2148, 2151 (2012). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for the purposes of the statute where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, --- U.S. ---, ---, 125 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

B.  Analysis

1.  **Petitioner's Passion/Provocation claim**

In his first claim, Petitioner contends that the trial court denied him Due Process by failing to *sua sponte* charge the jury on the elements of passion/provocation manslaughter as a lesser included offense of murder.  On direct appeal, the Appellate Division rejected this claim, finding both that Petitioner's having initiated the fight with Agee as a matter of law rendered Agee's use of the bat against Petitioner and his compatriots inadequate provocation as it was a response to Petitioner's own bellicose behavior, and because there was more than ample evidence that Petitioner had ample opportunity to cool off before returning to Manny's and firing upon Agee. The Appellate Division thus concluded that there were no facts to support a passion/provocation manslaughter charge, and that the judge's failure to charge on that offense was not error.

That a jury "instruction was allegedly incorrect under state law is not a basis for habeas relief."  *Duncan v. Morton*, 256 F.3d 189, 203 (3d Cir.) (quoting *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991)), *cert. denied*, 534 U.S. 919 (2001).  A petitioner can therefore only show an entitlement to habeas relief based on allegedly inadequate jury instructions where the petitioner proves that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  *Id.* (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  A reviewing court must therefore review a jury instruction in the context of the entire charge given by the trial court and in light of the entirety of the evidence submitted at trial.  *Duncan*, 256 F.3d at 203.  That a challenged instruction was "undesirable, erroneous, or even universally condemned," is insufficient to warrant habeas relief; a petitioner can only prevail on such a claim by showing that the instruction rendered his trial fundamentally unfair. *Id.*

Under New Jersey state law, "a court 'shall not charge the jury with respect to an included offense unless there is a rational basis' to convict a defendant of [that] lesser included offense." *State v. Savage*, 799 A.2d 477, 491 (N.J. 2002) (quoting N.J. Stat. Ann. § 2C:1-8(e)). Although passion/provocation manslaughter is in some cases a lesser-included offense for murder, a passion/provocation lesser included offense charge is only appropriate where the facts could be construed to suggest the following elements: "(1) reasonable and adequate provocation; (2) no cooling-off time in the period between the provocation and the slaying; (3) a defendant who actually was impassioned by the provocation; and (4) a defendant who did not cool off before the slaying." *State v. Josephs*, 803 A.2d 1074, 1109 (N.J. 2002). "[T]he passion of an assailant aroused as the result of injuries inflicted by his victim attempting to defend himself is, as a matter of law, insufficient to mitigate the assailant's culpability for the resulting homicide." *State v. Pasterick*, 285 N.J. Super. 607, 617 (App. Div. 1995). Here, the facts at trial clearly indicated both that Petitioner and his associates were the cause of the scuffle which resulted in Agee's taking up a baseball bat as they attacked him, and that Petitioner had more than sufficient time to cool off after he had left and before he returned to the scene and shot at Agee. Thus, as the Appellate Division explained, no passion/provocation charge was appropriate under state law in this case, and the trial court did not err in not charging the jury on that issue. Petitioner was thus not denied Due Process when no passion/provocation charge was given, and he has failed to show a valid basis for habeas relief on his first claim.

**2. Petitioner's acquittal motion claim**

In his next claim, Petitioner asserts that the trial court erred in denying what he refers to as a motion for a "mistrial." As noted in the Appellate Division, Petitioner's counsel made no such motion, and the decision Petitioner seeks to challenge is actually the denial of Petitioner's motion

for acquittal insomuch as he is actually asserting the proofs submitted by the Government were insufficient to support his convictions. The Appellate Division rejected this argument, finding that the testimony of the two eyewitnesses and the surveillance video provided more than sufficient evidence to support the conclusion that Petitioner had attempted to murder Agee and in so doing had shot and killed Cunningham, resulting in his murder conviction. In essence, Petitioner seeks in this claim to challenge the sufficiency of the evidence against him.

When a petitioner presents a claim challenging the sufficiency of the evidence provided at trial, "a reviewing court must ask 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Eley*, 712 F.3d at 847 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A court sitting in habeas review may therefore overturn a conviction based on insufficient evidence only "if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* (quoting *Jackson*, 443 U.S. at 324). "Under *Jackson*, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman v. Johnson*, 566 U.S. 650, 655 (2012). Under this "deferential federal standard," juries have "broad discretion in deciding what inferences to draw from the evidence presented at trial" and federal courts must not "unduly impinge[] on the jury's role as factfinder" by engaging in "fine-grained factual parsing." *Id.*

In this case, as noted by the Appellate Division, the evidence of Petitioner's guilt was overwhelming. Two eyewitnesses who had ample and close opportunity to observe Petitioner, including one who knew Petitioner previously, identified him as the shooter. Their testimony was corroborated by surveillance video which confirmed the basic thrust of their testimony, including

9

Petitioner's having approached and intentionally fired upon Agee, ultimately striking and killing Cunningham. In light of this testimony and video evidence, it is clear that there was more than sufficient evidence presented to permit a reasonable juror to find Petitioner's guilt beyond a reasonable doubt. Petitioner's challenge to the sufficiency of the evidence presented against him fails to set forth any valid basis for habeas relief.

**3. Petitioner's challenge to medical expert testimony**

Petitioner next asserts that the trial judge erred in permitting a medical examiner other than the one that performed Cunningham's autopsy to provide medical expert testimony regarding her death following the untimely passing of the doctor who conducted the autopsy. On direct appeal, the Appellate Division rejected this claim. It found that the medical examiner, as an expert witness, was permitted to rely on information not presented in evidence—the report of the deceased doctor—to form her opinions as to Cunningham's cause of death and testify as to information in that report after she had independently analyzed the information. It further found that no confrontation clause issue was presented, as defense counsel was provided an opportunity to cross examine the doctor on her opinions and in any event did not challenge the cause or nature of Cunningham's death. This ruling was neither contrary to nor an unreasonable application of applicable federal law and is instead directly in line with relevant Supreme Court precedent – specifically *Williams v. Illinois*, 567 U.S. 50 (2012). In *Williams*, the Court held that an expert witness may rely upon reports which have not been submitted into evidence in forming an opinion and could testify regarding that reliance without violating the defendant's confrontation rights. That is precisely what occurred in this case—the doctor testified regarding her own conclusions

based on her having reviewed the report of the deceased doctor. Petitioner has therefore shown no constitutional error sufficient to warrant habeas relief.[1]

### 4. Petitioner's alibi jury instruction claim

Petitioner also asserts that the trial judge erred in failing to *sua sponte* provide a curative instruction as to his alibi witness. The Appellate Division rejected the claim as thoroughly meritless on direct appeal without further comment. Contrary to Petitioner's assertion, the trial court's jury charge did provide specific instructions regarding the alibi testimony at trial. The instruction specifically directed the jury that the state, and not Petitioner, had to prove Petitioner was present at the time of the shooting and indeed fired the shots in question, that the jury could consider the evidence regarding why the alibi witness came forward only for credibility purposes, and that the jury could not "conclude that Miss Stuckey violated some obligation to come forward because she had no duty to speak on the subject with anyone." (Document 23 attached to ECF No. 14 at 41-42.) Read in context, the jury instruction clearly gave the jurors accurate direction as to how to evaluate the alibi claim and did not in any way place a burden of any kind on Petitioner. Given these instructions, it is clear that Petitioner's Due Process rights were not violated by the alleged failure of the Court not to provide further alibi-related jury instructions, and Petitioner is therefore not entitled to habeas relief on this ground. *Duncan*, 256 F.3d at 203.

---

[1] The Court further notes that any error would have clearly been harmless. No one involved in Petitioner's trial seriously disputed the nature or cause of Cunningham's death. Rather, the parties instead disagreed only on *who* had fired the shots—Petitioner or some other person mistakenly believed by Agee and Palmer to be Petitioner. Petitioner's claim would therefore fail to set forth a valid basis for habeas relief even if he could show a violation of his Confrontation Clause rights. *See, e.g., Fry v. Piller*, 551 U.S. 112, 116 (2007) (even errors of constitutional dimension will be considered harmless on collateral review "unless [the alleged errors] had a substantial and injurious effect or influence in determining the jury's verdict"); *Wright v. Vaughn*, 473 F.3d 85, 93-94 (3d Cir. 2006) (Confrontation Clause claims subject to harmless error review).

### 5. Petitioner's prosecutorial misconduct claim

Petitioner next argues that the prosecutor committed misconduct during his summation in discussing the credibility of witnesses and disputing defense counsel's version of events. The Appellate Division rejected this claim on direct appeal as lacking in merit without further comment. The duty of a prosecutor in a criminal proceeding is to see that justice is done rather than to secure convictions, and as such prosecutors must "refrain from [the use of] improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also United States v. Bailey*, 840 F.3d 99, 124 (3d Cir. 2016). While a prosecutor "may strike hard blows [during his summation], he is not at liberty to strike foul ones." *Berger*, 295 U.S. at 88; *Bailey*, 840 F.3d at 124. A criminal conviction, however, "is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Harris*, 471 F.3d 507, 512 (3d Cir. 2006) (quoting *United States v. Young*, 470 U.S. 1, 11 (1985). Thus, a prosecutor's improper comments during summation will only warrant habeas relief where those comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *see also Copenhefer v. Horn*, 696 F.3d 377, 392 n. 5 (3d Cir. 2012).

In this case, defense counsel's summation focused on three general issues: that Agee and Palmer had criminal records and thus were not credible, that Petitioner had presented an alibi witness, and that someone other than Petitioner had been found in possession of gun used in the shooting, which counsel used to argue that Petitioner had been misidentified. The focus of that summation was therefore on the credibility of the witnesses. In response, the prosecutor argued that two police officers disputed the alibi witness's testimony, specifically indicating that she had

12

told them either that she did not live with Petitioner or did not know where he was when initially questioned and further that she only provided the alibi later in time. The prosecutor further argued that Agee and Palmer's testimony was consistent with the evidence and not the result of self-serving attempts to curry favor with authorities as implied by counsel and that, to agree with defense counsel, the jury would have to believe that the majority of witnesses who testified at trial were not telling the truth.  Reviewed in context, the prosecutor's comments were fair comment aimed at directly addressing issues raised by defense counsel in his summation.  The prosecutor's comments thus did not deprive Petitioner of a fair trial and provide Petitioner with no basis for habeas relief.

### 6. Petitioner's ineffective assistance of counsel claims

In his remaining claims, Petitioner asserts that his trial counsel provided ineffective assistance of counsel in his handling of Petitioner's defense.  The standard applicable to Petitioner's claims of ineffective assistance of counsel is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984).  To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient.  This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007).  To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.
>
> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness

13

> of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.
>
> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

In his first set of ineffective assistance of counsel claims, Petitioner contends that counsel proved ineffective in pursuing a third party guilt defense based on the fact that police found the gun which killed Cunningham in the possession of another individual several months after Petitioner was arrested. Specifically, Petitioner contends that counsel should have better investigated the issue, presented evidence that this other individual was similar in appearance to Petitioner, should have moved to dismiss the indictment based on the discovery of the gun in the possession of another, and should have called this other individual as a witness at trial. The

14

Appellate Division rejected this claim on Petitioner's appeal from PCR relief, finding that Petitioner failed to show he was in any way prejudiced by defense counsel's strategic decisions regarding how best to use this information in light of the "damning evidence" of Petitioner's guilt.

That decision was neither contrary to nor an unreasonable application of federal law. Petitioner failed to present clear evidence that he and this other individual were truly similar in appearance, that this other individual was in the area at the time, or that this other individual was even available as a potential witness at trial or willing to speak with counsel on the issue. It is also thoroughly unlikely that pursuing the actions Petitioner desires would have changed the outcome of Petitioner's case. There is no evidence that the individual found with the gun months later was anywhere near Newark on the night in question or even possessed the gun at that time. Additionally, two eyewitnesses, one of whom knew Petitioner previously, identified Petitioner as the shooter and presented testimony which was further bolstered by the video recording of the shooting. In light of this "damning" evidence of Petitioner's guilt and the lack of clear evidence that counsel would have discovered further useable information by looking into or calling as a witness the man found with the gun, Petitioner has utterly failed to show prejudice. Likewise, any motion seeking to dismiss the indictment on this basis would certainly have been denied, and Petitioner suffered no prejudice on that basis either. Counsel fully used the stipulation regarding the gun as part of his argument in Petitioner's case, and Petitioner has failed to make even a prima facie showing that, had counsel chosen instead to try to call the man found with the gun, the result

of his case would have been different.² As Petitioner failed in any way to show that he was prejudiced by counsel's alleged failures regarding the third-party guilt issue, the decision of the state court to deny this claim without a hearing was neither contrary to nor an unreasonable application of federal law. *See Palmer*, 592 F.3d at 395. Thus, Petitioner's third-party guilt related claims fail to provide a basis for habeas relief.

In his remaining ineffective assistance claims, Petitioner contends that his trial counsel improperly handled his alibi defense in three ways: failing to call two witnesses to bolster the credibility of his alibi witness after the State rebutted her testimony; failing to object to the State's cross-examination of his alibi witness which Petitioner believes involved improper leading questions and suggestions that his alibi witness's initial silence and conflicting stories regarding Petitioner's whereabouts during various conversations with police improperly impugned Stuckey's testimony; and failing to cross-examine the State's rebuttal witness to suggest that he lied in impugning Stuckey's credibility based on the testimony of the two uncalled witnesses. The state PCR court and Appellate Division rejected this claim without a hearing, reasoning that the two uncalled witnesses would have at best bolstered Stuckey's credibility following the rebuttal witness. It found that the additional testimony would not have actually addressed the alibi itself but would only have countered the rebuttal witnesses claim that Stuckey had lied about being taken to the police station for hours on end for questioning. It also concluded that there was nothing improper about the State's cross-examination of Stuckey.

---

² Indeed, even if this Court were to consider Petitioner's newly submitted interviews with the man found with the gun, which are outside the state court record and therefore are not properly before the Court, *see Han Tak Lee v. Glunt*, 667 F.3d 397, 405 (3d Cir. 2012) (citing *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011)), calling this individual would have provided no useful testimony – he told Petitioner's investigator that he stole the gun from another person after the shooting in this case.

Having reviewed the record, it is clear that Petitioner was not prejudiced by these alleged failings. As noted by the state courts, the two uncalled witnesses, both of whom were members of Stuckey's family and at most could have testified that they picked Stuckey up from the police station, could not have addressed the key portions of the rebuttal witness's testimony and the state's cross examination of Stuckey—the testimony suggesting that Stuckey had changed her story regarding where Petitioner had been on the night in question several times. Thus, even if they had been called, they would have been of limited bolstering value and would not likely have had any noticeable impact on the outcome of Petitioner's trial. Likewise, the State was fully permitted to ask leading questions on cross-examination and clearly showed through cross-examination and the rebuttal witness that there was more than adequate foundation to pursue Stuckey's credibility and shifting version of events. Any objection to that cross-examination on the basis Petitioner suggests would have been baseless. Petitioner has thus failed to show that he was in any way prejudiced by counsel's handling of the alibi issue as it is clear that the testimony of the proposed bolstering witnesses would have had no effect upon the outcome of Petitioner's trial in light of the "damning" evidence of his guilt. The denial of Petitioner's ineffective assistance of counsel claims without a hearing was therefore neither contrary to nor an unreasonable application of federal law, and Petitioner is clearly not entitled to habeas relief. *Palmer*, 592 F.3d at 395.

Finally, as Petitioner's claims are all clearly without merit, it is clear that no hearing is necessary in this matter, and Petitioner's request for such a hearing (ECF No. 2) is therefore denied.

## III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of a state court proceeding unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this

standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). As all of Petitioner's claims are clearly without merit for the reasons discussed in this opinion, he has failed to make a substantial showing of the denial of a constitutional right, and Petitioner is therefore denied a certificate of appealability.

**IV.  CONCLUSION**

For the reasons set forth above, Petitioner's habeas petition (ECF No. 1) is DENIED, Petitioner's request for an evidentiary hearing (ECF No. 2) is DENIED, and Petitioner is DENIED a certificate of appealability.  An appropriate order follows.

   s/ Stanley R. Chesler   
STANLEY R. CHESLER
United States District Judge

Dated: December 1, 2020