UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **PHILIP A. HOLDEN,** | Civil Action No. 19-401 (SRC) |
| Petitioner, | |
| v. | OPINION |
| **THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, et al.,** | |
| Respondents. | |

**CHESLER**, District Judge:

Presently before the Court is the amended habeas petition of Petitioner Philip A. Holden brought pursuant to 28 U.S.C. § 2254. (ECF No. 44.) Respondents filed a response to the amended petition (ECF No. 47), to which Petitioner replied. (ECF No. 51.) For the following reasons, Petitioner's amended petition is denied and Petitioner is denied a certificate of appealability.

**I. BACKGROUND**

In his amended petition, Petitioner argues that his trial counsel was ineffective in failing to present a more comprehensive third-party guilt defense to suggest that Raijah Scott, who was arrested with the firearm used in the shooting of which he was convicted, was the actual shooter by either further investigating Scott, attempting to argue that Scott and Petitioner are similar in appearance, and by discovering and using the fact that Scott was arrested wearing an orange sweatshirt, which Petitioner believes to be the same one worn by the shooter in his case. In light of the fact that counsel did present an alibi defense at trial and agreed to a stipulation that the gun used in the shooting was found in the employ of another person several months after the shooting,

the merits of Petitioner's claim rise and fall with the extent to which the evidence Petitioner contends counsel should have discovered or presented would have undercut the clear and direct eyewitness testimony tying Petitioner to the shooting presented at trial, specifically the testimony of Craig Palmer and Elijah Agee.

During trial, Agee testified that he was present in front of Manny's Liquors on the night in question to make purchases to celebrate his birthday, although he admitted he had earlier sold drugs at or near the same location. (ECF No. 14-19 at 36-41.) While standing outside of the store, he was approached by three men who started a fist fight, apparently over drug dealing territory, ending when the three fled after Agee got a bat from a friend's car and chased one of the three. (*Id.* at 42-44, 74.) Agee testified that he thereafter returned to the area to look for his keys and a Bluetooth device he had lost in the shuffle. (*Id.* at 44-45.) Agee then saw a man come from behind him and begin firing in his direction, at which point he ran across the street and fled. (*Id.* at 45-48.) Agee identified Petitioner in both a photo array and in court as one of the three individuals involved in the fist fight and as the shooter. (*Id.* at 56-57.) Agee also identified the shooter recorded on the video from the liquor store as Petitioner. (*Id.* at 61-62.) Agee described Petitioner as wearing a "black bomber" vest or jacket over an "orange hoodie." (*Id.* at 82.) In the video recording taken from Manny's liquor, however, the vest or jacket worn over the hoodie appears to be more blue than black, and the hoodie itself appears to be a light or pale orange.

Craig Palmer's testimony largely mirrors Agee's. The record indicates that Palmer was previously acquainted with Petitioner both from a juvenile detention bid in the late 1980s and a shared jail stint in the early 2000s. (*See* ECF No. 14-20 at 4-5, 13-14.) Palmer knew Petitioner chiefly because, during their shared jail time in or around 2001-2002, Petitioner was the barber who cut his hair in the jail. (*Id.* at 14-18.) Palmer testified that on the night in question, he went

to the liquor store to purchase drugs from Agee while walking his dog. (*Id.* at 25-27.) Palmer witnessed the confrontation between Agee and the three men, and saw Agee chase one away with a bat. (*Id.* at 28-29.) Palmer then saw Agee return to the area. (*Id.* at 31-32.) While waiting to speak to Agee, Palmer saw Petitioner speaking to another man down the street from the liquor store. (*Id.*at 34-35.) Petitioner then began walking towards Palmer and Agee, at which point Palmer recognized Petitioner and moved as if to greet him, but did not do so because of Petitioner's demeanor at that time. (*Id.*) Palmer described Petitioner having his hands in his pocket and "trying to put his face [into a] bandanna" Petitioner had around his neck. (*Id.*) Petitioner walked past Palmer, who got a good look at him and was positive that it was in fact Petitioner, and then opened fire on Agee. (*Id.* at 35-36.) Palmer then fled the area once the shooting began. (*Id.* at 36-37.) Palmer identified Petitioner in open court as the shooter. (*Id.* at 37-38.)

In his amended petition, Petitioner asserts that Agee and Palmer misidentified him and that counsel could have pressed this issue by comparing him to Scott. In so doing, he relies on evidence both within and beyond the state court record. Specifically, Petitioner points to the alleged physical similarities between Petitioner and Scott – with Petitioner having been 5'7" tall and 220 pounds during the period in question while Scott was 5'8" tall and 170 pounds. (*See* ECF No. 20-4 at 10; ECF No. 44-12 at 2.) Scott, however, was significantly younger than Petitioner – being only twenty-four years old at the time in question compared to Petitioner's thirty-nine. (*Id.*) Petitioner also relies on arrest reports indicating that at the time he was arrested in September 2010 with the firearm used in the January 2010 shooting, Scott was wearing an orange sweatshirt. (*Id.* at 8.) Petitioner also presented the Court with a discussion an investigator had with Scott in 2020 in which Scott stated that he had stolen the gun from a car after the January 2010 shooting, of which Scott had been unaware. (ECF No. 17 at 6-7.)

## II. DISCUSSION

### A. Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." The petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, --- U.S. ---, ---,132 S. Ct. 2148, 2151 (2012). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for the purposes of the statute where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, --- U.S. ---, ---, 125 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute

that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**B. Analysis**

In his amended petition, Petitioner asserts that his trial counsel provided ineffective assistance of counsel by failing to better investigate or assert a third-party guilt defense at trial by arguing Scott, rather than Petitioner, was the shooter. The standard applicable to Petitioner's claims of ineffective assistance of counsel is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.
>
> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

The Appellate Division rejected this claim in Petitioner's PCR appeal, finding that even had counsel presented further evidence, it would not likely have changed the outcome of Petitioner's case in light of the "damning evidence of his guilt," specifically the eyewitness testimony of Palmer and Agee. (*See* ECF No. 14-16 at 11.) This decision was neither contrary to nor an unreasonable application of federal law.

Petitioner makes much of the idea that, had counsel further investigated, he may have discovered that Scott was at least superficially similar in appearance to Petitioner insomuch as they were both average or slightly below average in height and dark skinned, and that Scott was arrested while wearing an orange sweatshirt and in possession of the firearm used in the shooting in this case. The problem with Petitioner's position, however, is that he largely ignores several key facts – Palmer specifically testified to seeing and recognizing Petitioner's face – despite later attempts

by Petitioner to hide his face in a bandanna or similar piece of clothing – and recognizing Petitioner's broad build. Agee likewise described Petitioner as being of a "stocky buil[d] like he had weight on him," a phrase which would certainly match an individual such as Petitioner, who was approximately 5'7" and 220 pounds, but would be a poorer fit for Scott, who was considerably lighter. (*See* ECF No. 44-14 at 3.) The witnesses who were in the store who spoke with police likewise described the shooter as being around 5'6" and "[not] too fat," and between 200 and 220 pounds. (ECF No. 44-10 at 7.) The pictures provided in the record of the two individuals, likewise do not support Petitioner's contention that the two were extremely similar in appearance – Petitioner was a few inches shorter, considerably heavier, and fifteen years older. Given the eye witness testimony and the fact that the jury in convicting Petitioner explicitly rejected both Petitioner's alibi and the stipulation that the murder weapon was found in the possession of another individual eight months later as relevant to this case, it is not likely that the jury's verdict would have been different had counsel made greater efforts to place the blame upon Scott; indeed, doing so could well have backfired by permitting Agee and Palmer to specifically reject Scott during trial had he been identified as a singular alternative candidate by counsel. Counsel's choice to rely on an alibi defense and disputing the eye witness testimony in general, rather than focus on one possible individual whose characteristics are generally dissimilar to Petitioner and who was connected to the case only after the fact, would therefore have been reasonable.

Moving beyond the evidence in the original record, Petitioner also makes much of slight discrepancies between the testimony of Agee and the full video of events outside of Manny's Liquors. While there is some difference in relatively minor aspects between the video and Agee's description of the evening question, those discrepancies are not of any great import and in the end do not call into question Agee's testimony of having seen the shooter before the shooting occurred,

and seeing him at the time of the shooting itself. Although Petitioner may dispute whether the jacket the shooter wore over his sweatshirt was truly a "bomber" jacket or vest as described by Agee or some other style, that discrepancy of description would hardly have made a difference had the jury been called to hyper fixate on it.

Petitioner also focuses on the fact that Scott was arrested wearing a brightly colored orange sweatshirt according to his arrest reports from the fall of 2010, some eight months after the winter shooting. Petitioner hangs his hat on this point, which was not properly raised in the state courts, largely because the shooter was wearing what appears on the video to be a pale orange hooded sweatshirt which may or may well not have been at least vaguely similar to the orange sweatshirt Scott possessed when he was arrested. That both garments can be described as "orange sweatshirts," however, does not clearly indicate that they are similar or identical at all. The arrest reports do not specifically indicate that Scott's sweatshirt was in fact orange, and seem to suggest that it was brightly colored, rather than the more muted orange present on the shooter in the video. Petitioner's base speculation that they must be the same sweatshirt, without actual direct evidence that they were more similar than merely being of the same general color, is insufficient to show that the jury's outcome would in any way have been affected by the fact that Scott was arrested in an orange sweatshirt *eight months* after the shooting.

At the end of the day, there were no witnesses who put Scott on the scene. There was no testimony to connect him to the shooting. The sweatshirt issue appears to be more of a red herring than a true point of connection, and the only actual evidence connecting Scott to the shooting was the fact that he was found with the gun, which Scott apparently told Petitioner's investigator he stole from a car, long after the shooting in this matter occurred. Given the large difference in age and weight between Petitioner and Scott, the lack of truly "striking" similarities between Petitioner

and Scott, and the fact that Palmer had history with and prior knowledge of Petitioner it is doubtful that pointing to Scott would have had any actual benefit to Petitioner at trial beyond that already provided by the stipulation that someone other than Petitioner was found to possess the gun in question many months after the shooting. Petitioner therefore cannot show that he was prejudiced by counsel's alleged failure to investigate or present a better third-party guilt defense instead of the alibi defense counsel chose to pursue at trial, and Petitioner has failed to show ineffective assistance of counsel even considering the extra-record evidence on which he now relies. The state courts' rejection of Petitioner's claims was thus neither an unreasonable application of federal law or the facts of Petitioner's case, and Petitioner's amended petition is therefore without merit. As Petitioner's claims are clearly without merit on the record before the Court, Petitioner's request for an evidentiary hearing or further discovery are in turn denied.

### III.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of a state court proceeding unless he has "made a substantial showing of the denial of a constitutional right."  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). As Petitioner's amended petition is clearly without merit for the reasons discussed in this opinion, he has failed to make a substantial showing of the denial of a constitutional right, and Petitioner is therefore denied a certificate of appealability.

## IV. CONCLUSION

For the reasons set forth above, Petitioner's amended habeas petition (ECF No. 44) is **DENIED**, and Petitioner is **DENIED** a certificate of appealability. An appropriate order follows.

s/Stanley R. Chesler
Hon. Stanley R. Chesler,
United States District Judge

Dated: November 5th, 2025